# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs January 25, 2011

## STATE OF TENNESSEE v. CARL LEE BRIGHT

**Appeal from the Criminal Court for Monroe County**
**No. 09-088     Amy F. Reedy, Judge**

**No. E2010-00903-CCA-R3-CD - Filed May 27, 2011**

The Defendant, Carl Lee Bright, was convicted by a Monroe County Criminal Court jury of driving under the influence (DUI), fourth offense, a Class E felony, and was sentenced as a Range I, standard offender to two years' confinement. See T.C.A. § 55-10-401 (Supp. 2009) (amended 2010). On appeal, the Defendant contends that the trial court erred by (1) denying his motion to dismiss the case due to insufficient evidence, (2) denying his motion to suppress evidence, (3) denying his motion to dismiss the indictment or remand for a preliminary examination because his Sixth Amendment right to counsel had been violated, and (4) imposing confinement for the maximum allowable sentence. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOSEPH M. TIPTON, P.J., delivered the opinion of the Court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

Steve McEwen, Mountain City, Tennessee, and Chessia Allyn Cox, Assistant District Public Defender (on appeal); Robert W. White, Maryville, Tennessee (at trial), for the appellant, Carl Lee Bright.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Assistant Attorney General; Steven Bebb, District Attorney General; and Paul A. Rush and James Stutts, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At the trial, Tellico Plains Police Officer Harvey Presley testified that at the time of the arrest, he had been a patrolman for two years and that at the time of the trial, he was a school resource officer. He said he served in the military for twenty-two years before

becoming a police officer. He said he underwent training at the police academy to recognize clues of intoxication. He agreed that he had seen many intoxicated people during his time in the military and while on patrol in Monroe County.

Officer Presley testified that he answered a call from dispatch about a possible impaired driver on December 12, 2008. He said that he saw the Defendant drive away from Shorty's Market on Highway 360 in Tellico Plains and that the Defendant drove an older model, blue Nissan or Datsun. He said that he followed the car and that on the first curve in the road, which was sharp, the Defendant went around the curve in the wrong lane and stayed in that lane through the curve.

Officer Presley testified that he followed the Defendant for a mile to a mile and a half before stopping him. He said that it was a little after 7:00 p.m., that it was dark, and that there were no streetlights on Highway 360. He estimated the Defendant drove about ten miles per hour over the speed limit on some sections. He said that when the Defendant drove into the second curve, he again crossed completely into the oncoming lane and remained in that lane through the curve. He said the curves were both blind turns, meaning that oncoming traffic could not see approaching cars. He said that on the straight section, the Defendant drove down the middle and partially in both lanes for about a quarter of a mile.

Officer Presley testified that he followed the Defendant from about twenty feet and that he turned on his emergency lights and siren at the first straightaway where oncoming traffic could see him. He said that it took the Defendant one to two minutes to pull over and that the highway had an incomplete shoulder. He said that the Defendant was in the driver's seat and that there were no passengers. He said that when the Defendant rolled down his window, there was a strong smell of alcohol coming from the Defendant's breath and clothes and that the Defendant's eyes were red and "glassy." He said that he asked the Defendant if he had been drinking and that the Defendant answered, "Yeah."

Officer Presley testified that the Defendant removed his driver's license from his wallet with normal movements. He said the Defendant's speech was heavily slurred. He said that after checking the license with central control, he asked the Defendant to get out of his car and perform field sobriety tests. He said he told the Defendant the reason for the stop was that the Defendant had driven on the wrong side of the highway.

Officer Presley testified that the Defendant attempted to perform two field sobriety tests: the one-legged stand and the nine-step, walk-and-turn test. He said he administered the tests on a flat, paved surface beside the car. He said the Defendant staggered as he left his car and had to lean against the car for balance. He said that he did not ask the Defendant about injuries, that he did not remember the Defendant's telling him about any injuries, and

that he usually would have noted injury information in his report. He said he was not sure which test the Defendant attempted first.

Officer Presley testified that he demonstrated the one-legged stand and gave the following instructions: "Standing on one leg, your left leg, and holding your right leg approximately four to six inches off the ground and keeping your hands down at the side." He agreed that the stand was supposed to last thirty seconds and that the driver was not supposed to use his hands for balance. He said the Defendant attempted to perform the one-legged stand but was unable to complete the test. He said that when the Defendant tried to stand on his left leg, he was "stumbling everywhere," could not keep his hands down, and never started counting. He said he rated the Defendant's performance a "definite fail."

Officer Presley testified that he demonstrated the nine-step, walk-and-turn test for the Defendant and gave the following instructions: "[H]eel to toe, go down and take nine steps and on your ninth step take a short pivot, right pivot around and repeat the test coming back." He said he told the Defendant to stand with his hands at his side and his left foot in front of his right. He said the Defendant did not ask any questions. He said that when the Defendant attempted the test, he counted quickly to nine while he was walking but did not count his steps, stumbled to his right, did not walk on a line or in any discernible pattern, and turned around to walk back instead of pivoting as instructed. He said he stopped the Defendant after five or six steps and let the Defendant lean on the car.

Officer Presley testified that he had no doubt that the Defendant was under the influence of alcohol or a narcotic and that he arrested the Defendant for DUI. He said he put the Defendant in the patrol car and took him to the Monroe County Jail. He said that in the patrol car, he smelled alcohol on the Defendant. He said that at the jail, he and the Defendant walked from the back parking lot about ten feet uphill into the booking area. He said the Defendant was not handcuffed because his wrists were too big. He said he walked to the side of the Defendant and held the Defendant's arm for support. He said that as they walked, the Defendant stayed on a fairly straight line but was still unsteady and stumbling. He agreed that the Defendant's movements were exaggerated but denied that the Defendant was limping. He said that the Defendant's speech was still slurred and that the Defendant still smelled of alcohol.

Officer Presley testified that he and the booking officer took the Defendant into a small room to administer a breathalyzer, that he read the implied consent form to the Defendant, and that he gave the Defendant instructions for blowing into the breathalyzer machine. He said that about twenty-five minutes elapsed between the traffic stop and booking and that there was a twenty-minute wait to use the breathalyzer machine. He identified the implied consent form and said that both the box indicating agreement to take

the test and the box indicating refusal were checked. He said that at first, the Defendant said he would take the test but that after waiting ten minutes, the Defendant refused. He said the booking officer was present when the Defendant changed his mind. He agreed it was difficult to read the Defendant's name from the signature. He said that the Defendant was belligerent on the way to the station and that the Defendant became combative and loud during booking. He said that after refusing the test, the Defendant was combative with the booking officer.

On cross-examination, Officer Presley testified that he was trained according to National Highway Traffic and Safety Administration standards and that he studied a manual during his training. He identified and read the narrative portion of the offense report:

> On Friday, December the 12th, 2008, at about 7:21 P.M. I initiated a traffic stop on a blue vehicle bearing Tennessee Registration 822-VFF matching the [existing] description of a possible drunk driver vehicle given to me by Monroe County E-911 dispatch. When I made contact with the operator Mr. Carl Lee Bright I noticed an odor of alcoholic beverage. I asked Mr. Bright if he had been drinking and he said "yes." I asked Mr. Bright to exit the vehicle and perform the field sobriety tasks, one leg stand and nine step walk and turn. Mr. Bright exhibited indicators that he was intoxicated. The second task was the walk and turn which he failed by not keeping his balance when told how to stand to perform the task. The last task given was the one leg stand in which Mr. Bright failed by not being able to keep his right leg four to six inches from the ground in a steady manner. I placed Mr. Bright under arrest and transported him to the Monroe County Sheriff's Department for a test on the Intox EC/IR II. Mr. Bright refused to submit to the Intox EC/IR II test upon arrival at the Monroe County jail. Mr. Bright was then charged with Implied Consent. This did happen in the Town of Tellico Plains, Monroe County, Tennessee.

He agreed he did not note in his report the Defendant's driving over the line on the straightaway, the Defendant's difficulty walking to booking, the strength of the alcohol odor, or the Defendant's bloodshot eyes, slurred speech, or belligerence.

Officer Presley testified that there was a highway sign indicating a sharp curve before the first curve where he observed the Defendant driving in the oncoming lane. He said he did not activate his emergency lights and siren after the first curve, and he agreed it was

-4-

common for drivers to touch the center line or go over it when negotiating sharp curves. He said the second curve also had a sign indicating that it was sharp and agreed he did not activate his emergency equipment immediately after observing the Defendant go into the oncoming lane in the second curve. He said that he estimated the Defendant was speeding and that his patrol car's radar could not track a car's speed while both were traveling the same direction. He agreed that at twenty feet behind the Defendant's car, the patrol car would have been visible in the Defendant's rearview mirror. He said he did not know if the Defendant noticed the patrol car and agreed a driver will drive more erratically sometimes when keeping one eye on a patrol car. He agreed the Defendant's driving was extremely dangerous. He said he stopped the Defendant after observing his driving for about 2500 feet.

Officer Presley testified that the Defendant had his headlights on, pulled over promptly after the emergency lights were activated, rolled his window down when the officer approached, offered his license, answered "yes" when asked if he had been drinking, and exited his car when asked to do so. He agreed that non-compliance with such requests can be a sign of intoxication, that there were other reasons for slurred speech besides intoxication, that the odor associated with alcohol came from flavoring rather than alcohol, and that alcohol odor did not necessarily indicate intoxication. He did not remember the Defendant's telling him about running a machine to cut firewood that created smoke.

Officer Presley testified that he did not remember a fog line on the highway where the Defendant performed field sobriety tests. He agreed that someone with a previous leg injury might not perform the one-legged stand test well, but he denied that the Defendant told him about any injuries. He agreed that he asked the Defendant to stand on his left leg and that the Defendant failed to hold his right leg off the ground. He said he only recorded one clue for intoxication on the one-legged stand test because the Defendant "just couldn't do it." He agreed that the only clue he wrote in his report for the nine-step, walk-and-turn test was that the Defendant took a few steps that were not in a straight line. He acknowledged that the line was imaginary and that the Defendant's line and his may have been different. He said no blood alcohol testing was available that night.

On redirect examination, Officer Presley testified that in the offense report, he wrote that the Defendant exhibited indicators of intoxication. He said the narrative's purpose was to state the offense for which the Defendant was being arrested and why. He noted that his own speech was slurred on certain words because of his dentures but that the Defendant's speech on the night of the offense was much more slurred than his. He said that there were no open containers of alcohol or spots of spilled alcohol that would have produced the odor he noticed and that the odor came from the Defendant. He said he believed the Defendant was too intoxicated on that night to drive, speak correctly, walk in a straight line, stand on one leg, or stand on both legs.

Monroe County Sheriff's Department Corrections Officer David Taylor testified that he was on duty when the Defendant arrived for booking and that he had worked for the department for about three months at the time. He said Officer Presley called him as a witness for the Defendant's breathalyzer test. He said the Defendant came into booking with an unsteady gait, slurred speech, and strong smell of alcohol. He said the Defendant was not limping and was able to come through the door on his own. He did not remember whether the Defendant was handcuffed. He said the booking procedure was to search the Defendant and obtain his information.

Officer Taylor testified that the breathalyzer machine was in the booking room. He said that it took about twenty minutes for the machine to clear, during which time a suspect must be watched closely and not allowed to touch anything. He said that after about ten minutes, the Defendant became belligerent, loud, and aggressive and said he was no longer willing to take the test. He said neither officer acted aggressively toward the Defendant. He said he had no doubt that the Defendant was intoxicated. He said he did not see any spots on the Defendant where it looked like alcohol had spilled. He said that the department's policy was to put individuals who were "cussing, screaming, won't answer questions" in a holding cell and that he put the Defendant in a holding cell.

On cross-examination, Officer Taylor testified that he had not been trained in intoxication detection. He disagreed that grain alcohol had no odor. He agreed that an individual could be belligerent without being intoxicated. He said that he never spoke to the Defendant before that night and that he watched how the Defendant walked as he entered the booking area. He said the Defendant's jail intake was recorded.

James R. "Ricky" French testified that he and the Defendant went to school together and were friends. He said he had lived on Highway 360 about a mile outside of Tellico Plains for thirty years. He said that on the evening of December 12, 2008, he and the Defendant split wood at a garage where the Defendant worked part-time. He said he arrived after the Defendant and stayed about an hour. He said that he and the Defendant left about the same time and that before they left, the Defendant drank a "little shot" of liquor because he was coming down with the flu. He said the Defendant's drink was not from a shot glass and "could have been a little bottle." He said he did not drink anything at the garage. He said that during the hour he split wood with the Defendant, he did not smell alcohol on the Defendant and did not think the Defendant was intoxicated. He said that if the Defendant had seemed intoxicated at the garage, he would have told the Defendant to drive straight home.

Mr. French testified that the garage was five to seven miles from Shorty's Market and that the market was on his way home. He said that he drove behind the Defendant and that

they stopped at the market. He said that on the way to the market, the Defendant's driving seemed normal and that if the Defendant drove into the other lane, it was about as much as he did. He said the road was small, narrow, and curvy. He said the Defendant did not seem intoxicated at the market. He said the Defendant usually walked with a limp because his ankles had been injured in a "wreck or two."

Mr. French testified that he left the market before the Defendant and that he drove to his house three-quarters of a mile farther down Highway 360. He said that he drove that part of Highway 360 at least twice a day and that the highway had a white fog line on each side. He said the first curve on the stretch of road between the market and his house was sharp, dangerous, and went to the left. He said that after the first curve, the road wound to the right, again to the left, and then straightened into a mile-long section on which people used to race. He said it was common for people to drive in the middle of the road around the sharp curves.

Mr. French identified a photograph and testified that it showed Highway 360 with Shorty's Market on the left and the direction toward Tellico on the right. He said he took the photographs the day before the trial. He said that one photograph showed an unidentified car negotiating the first sharp curve after the market and that two photographs showed an unidentified truck negotiating the curve. He said he took the photograph of the car from the market side of the curve and the photographs of the truck from the opposite direction.

On cross-examination, Mr. French testified that he did not speak to anyone from the district attorney's office before the trial. He said that he usually visited the Defendant a couple of times a week at the garage and that he did not know if their relationship would be damaged if he testified against the Defendant. When asked to clarify what he meant by the Defendant's drink at the garage possibly being a little bottle, he said it could have been a half-pint or a pint. He agreed the bottle could have been in the Defendant's coat or pants pocket and said it could have been behind a wood chunk. He agreed he did not know what the Defendant drank before they split wood. He said that he saw the Defendant drink one swallow and that it was not out of a glass.

Mr. French testified that he did not know whether the Defendant drank from a bottle as he drove to the market but that he did not think the Defendant drank as he was driving. He said he thought the Defendant left the market a minute or two after he did, but he agreed he did not see the Defendant leave. He said he left the market at about 7:30 p.m. He agreed he did not know if the Defendant had a bottle with him or if he drank while in the market parking lot. He said that he had been drinking with the Defendant in the past and that he knew what the Defendant sounded like when his speech was slurred due to intoxication. He agreed the Defendant also became wobbly and sometimes confused when he was drunk.

-7-

The Defendant testified that he was fifty-one years old at the time of the trial and a lifelong resident of Monroe County. He said he worked at mechanics, logging, and splitting and selling firewood. He said that on December 12, 2008, he started splitting firewood at about 2:30 p.m. at a garage where he worked occasionally. He said he quit splitting firewood at about 6:00 p.m. and left about 6:45 or 7:00 p.m. He agreed splitting wood was hard, physical work and said he was tired when he stopped.

The Defendant testified that the garage's owner and Mr. French were present around the time he stopped splitting firewood. He said that at about 6:30 p.m., William Hughes and his son arrived and that Mr. Hughes was celebrating his birthday and offered the Defendant half a shot of Jim Beam out of a fifth. He said that the half a shot was all he drank and that he did not drink anything earlier that day. He said that he had taken Nyquil for a cold about eighteen hours earlier but that he did not take any medication on that day.

The Defendant testified that he had broken his legs in seven places. He said he broke his right tibia in 2008. He identified four x-rays taken in February 2008 at the University of Tennessee Medical Center and said that the x-rays showed a plate and screws from a 1988 surgery to repair his right ankle after it was "crushed" in an accident. He said he had also broken his right femur, left femur, and left fibula in different accidents. He said that all of his teeth were pulled and that he spoke differently after losing his teeth. He said his leg injuries affected his ability to walk, especially when he worked and then sat afterward for about thirty minutes. He said hard labor made his ankle and knees stiff and made him almost unable to walk. He said that when he left the garage on that night, he was tired and his legs were aching. He said his legs became stiffer after the drive to the market.

 The Defendant testified that after he left the garage, he drove six or seven miles to the market and that Mr. French drove behind him. He said that he saw Mr. French at the market and that he left the market two to three minutes after Mr. French. He said that he did not have anything to drink other than the shot at the garage and that he did not drink in his car, at the market, or in the parking lot. He said that he was driving home to Citico when he left the market and that he had nothing to drink after he left.

The Defendant testified that he was familiar with Highway 360 between the market and where he was stopped and that he drove it three to four times a week. He said that he first noticed Officer Presley behind him right before Poplar Bluff Church Road and that Officer Presley followed him for about a mile before he saw the officer's emergency lights. He said that he drove the curves in his usual manner and that he did not drift into the oncoming lane. He said that the officer stopped him at the two-mile marker and that he performed a walk-and-turn test on the white line.

The Defendant testified that the officer asked if he had been drinking and that he said yes but did not say how much. He said he performed a test in which he stood on one leg and held the other in the air. He said that his legs were stiff during the test but that he thought he did well. He said that he was not drunk and that the shot of whiskey did not affect his driving or ability to perform the field sobriety tests.

The Defendant testified that he cooperated with Officer Presley on the way from the scene to the jail. He said that at the jail, he wanted to take a blood test but was told he could not and that he did not want to take the breathalyzer test. He said he thought he "acted pretty good" because the officers gave him a blanket and mattress for the holding cell. He said he initially agreed to take the breathalyzer test but changed his mind because he did not want to be accused of something he did not do. He said that because they treated him like "a drunk," he "figured [he] would act like one." He said he was not intoxicated.

On cross-examination, the Defendant testified that Officer Presley was wrong about the way he drove and that the reason the officer stopped him was because of a call reporting a drunk driver. He agreed it was not a coincidence that the officer received a call reporting a drunk driver with a description of a car that matched his. He said that he knew there were sharp turns on the highway, that he slowed down for them, and that he never left his lane of travel. When asked why two officers saw signs of impairment in his behavior, he said he thought he walked the straight line pretty well. When asked if Officer Presley was not simply mistaken but "making it all up," the Defendant said, "That's exactly right."

The Defendant testified that he did not know why Mr. French said he drank a shot out of a bottle for his cold rather than to celebrate a birthday. He said the only alcohol he drank that day was half a shot out of a shot glass. He said he signed the implied consent form to give permission for a blood alcohol test, but he agreed he refused to take a breath test. He denied that his signature was illegible on the consent form and said that he always had trouble with the "h" and the "t" in his name. He agreed his signature was legible on the bond slip the next day. When asked if he had time overnight to "sober up" before signing the bond slip, he said, "Yes." He said he did not act intoxicated at the jail.

The Defendant testified that if the officers had given him a blood test, they would have known the alcohol content of his blood. He said that with the breathalyzer test, his alcohol content probably would have been about 0.03 because drinking a half-shot of whiskey made the blood alcohol content about 0.03. When asked how he knew, he said he had taken a breathalyzer test before.

On rebuttal, Officer Presley testified that he heard the Defendant's testimony. He said that he would not describe the Defendant's speech at the trial as slurred and that the

Defendant's speech was much more slurred at the time of the offense. He said that when the Defendant and he were at the breathalyzer machine, the Defendant never requested another type of test. On cross-examination, Officer Presley testified that he was able to compare the Defendant's speech he heard at the trial to what he heard eight months before.

The jury convicted the Defendant of DUI. The State presented copies of certified judgments showing the Defendant's previous convictions of DUI in Monroe County Criminal Court on October 31, 2000; in McMinn County Circuit Court on October 4, 2002; and in Monroe County General Sessions Court on June 7, 2005. The jury convicted the Defendant of DUI, fourth offense, and the trial court sentenced him to two years' confinement. This appeal followed.

**I**

The Defendant contends that the trial court erred by denying his motion to dismiss due to insufficient evidence because (1) the traffic stop was not recorded, (2) Officer Presley's testimony failed to show that the Defendant drove erratically, (3) Officer Presley did not include in the offense report all observations to which he testified at the trial, (4) Mr. French testified that he saw the Defendant drink only one shot of whiskey, and (5) the Defendant presented evidence of alternative explanations for the clues indicating impairment. The State contends that the evidence was sufficient to support the conviction. We agree with the State.

Our standard of review when the sufficiency of the evidence is questioned on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). We do not reweigh the evidence but presume that the trier of fact has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the State. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions about witness credibility are resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

No requirement exists that the State prove its case by more than the arresting officer's testimony in order to establish proof beyond a reasonable doubt. See State v. Vassar, 870 S.W.2d 543, 544 (Tenn. Crim. App. 1993). In the light most favorable to the State, the proof shows that Officer Presley stopped the Defendant after observing that the Defendant's car matched the description given by a 9-1-1 informant and observing that the Defendant drove into the oncoming lane through two curves and straddled the double line on a straight section. The Defendant smelled strongly of alcohol, walked with an unsteady gait, had bloodshot eyes

and slurred speech, was unable to complete two field sobriety tests, and became increasingly belligerent during the booking process.

The Defendant questions Officer Presley's testimony that he believed the Defendant's driving posed a safety hazard because the officer did not stop the car after the first curve. He also argues that Mr. French's testimony showed that he drank only one shot of whiskey and drove without noticeable impairment. Officer Presley testified that he waited to stop the Defendant until an oncoming driver would have a clear view of both the Defendant's car and the patrol car. As the State notes, Officer Presley and Mr. French observed the Defendant's driving at different times and at different locations. Mr. French also testified that he saw the Defendant drink a shot of whiskey from a bottle about an hour before the traffic stop, and he admitted that the Defendant was not directly in his sight for much of that hour. We conclude that a rational trier of fact could have found beyond a reasonable doubt that the Defendant was driving while under the influence of alcohol.

## II

The Defendant contends that the trial court erred by denying his motion to suppress evidence because Officer Presley stopped the Defendant without reasonable suspicion that he was driving while impaired. The State contends that the combination of the informant's tip and Officer Presley's observations provided specific and articulable facts on which Officer Presley based his reasonable suspicion. We agree with the State.

A trial court's factual findings on a motion to suppress are conclusive on appeal unless the evidence preponderates against them. State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996); State v. Jones, 802 S.W.2d 221, 223 (Tenn. Crim. App. 1990). Furthermore, questions about the "credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." Odom, 928 S.W.2d at 23. The application of the law to the facts as determined by the trial court is a question of law which is reviewed de novo on appeal. State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

The Fourth Amendment to the United States Constitution and article 1, section 7 of the Tennessee Constitution protect against unreasonable searches and seizures. See State v. Downey, 945 S.W.2d 102, 106 (Tenn. 1997). An automobile stop constitutes a seizure within the meaning of these constitutional provisions. Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 450 (1990); State v. Pulley, 863 S.W.2d 29, 30 (Tenn. 1993); State v. Binion, 900 S.W.2d 702, 705 (Tenn. Crim. App. 1994). The police may stop a vehicle if they have reasonable suspicion based upon specific and articulable facts that an occupant is violating or is about to violate the law. See United States v. Brignoni-Ponce, 422 U.S. 873 (1975);

State v. Watkins, 827 S.W.2d 293, 294 (Tenn. 1992); Hughes v. State, 588 S.W.2d 296, 305 (Tenn. 1979). In determining whether an officer's reasonable suspicion is supported by specific and articulable facts, "a court must consider the totality of the circumstances–the entire picture." State v. Moore, 775 S.W.2d 372, 377 (Tenn. Crim. App. 1989).

At the hearing on the motion to suppress, Officer Presley's testimony was similar to his testimony at the trial. He described the 9-1-1 dispatch report in more detail and testified that dispatch told him a possible drunk driver had run someone off Highway 360 and was coming into the city. He said dispatch told him the driver was at Shorty's Market and was leaving. He said that as he arrived at the market, dispatch gave him a description of the car and a license plate number. He said that he saw the Defendant's car driving onto the highway and that it matched the description and had the same plate number. He said that the dispatch call occurred at 7:21 p.m. and that he began following the car at 7:26 p.m.

On cross-examination, Officer Presley testified that when he received the call from dispatch, a citizen had provided the information to the operator. He said he followed the Defendant's car for at least a mile and that he first saw the car move into the oncoming lane about 500 feet after he began following it. He said that the next curve was about 1000 feet ahead and that he stopped the car after about another 1000 feet. He agreed the only reason he gave in the offense report for stopping the Defendant was that the Defendant's car matched the 9-1-1 description.

The Defendant argues that because the 9-1-1 caller was unidentified, Officer Presley did not have reasonable suspicion to stop the Defendant based on the caller's tip alone. The State responds that the combination of the informant's tip and Officer Presley's observations supported reasonable suspicion. We agree. A known citizen informant is presumed to be reliable. State v. Luke, 995 S.W.2d 630, 636 (Tenn. Crim. App. 1998) (noting that a citizen informant's information is presumed to originate from eyewitness experience). When the citizen informant's identity is unknown, the information provided is not a sufficient basis for reasonable suspicion without corroborating circumstances. Id. However, when an anonymous citizen informant's tip is corroborated by the informant's basis of knowledge and circumstances known to the police, the totality of the circumstances can support the officer's reasonable suspicion. Id. (citing Pulley, 863 S.W.2d at 32).

In this case, five minutes elapsed between the informant's call and when Officer Presley began following the Defendant. The officer saw the Defendant's car leave the location identified by the informant. It is undisputed that the car and license plate matched the informant's description. We conclude that the short elapsed time, the Defendant's location, and the description matching his car established the tip's reliability.

The Defendant questions Officer Presley's credibility by arguing that he testified to more observations of the Defendant's driving than he wrote in his report and that his testimony varied regarding the distance he traveled while following the Defendant. Officer Presley testified at the suppression hearing and at the trial that he saw the Defendant cross into the oncoming lane through two curves and straddle the center line on a straightaway. The trial court accredited Officer Presley's credibility when it stated that in addition to the description corroborated by the informant's tip, Officer Presley "saw this vehicle cross over into the other lane two times before he initiated his blue lights." We conclude that the trial court correctly evaluated the totality of the circumstances supporting the officer's reasonable suspicion for the investigatory stop and did not err by denying the Defendant's motion to suppress.

## III

The Defendant contends that the trial court erred by denying his motion to dismiss the indictment or remand for a preliminary examination because his Sixth Amendment right to counsel had been violated. The State contends that the Defendant knowingly, voluntarily, and intelligently waived his right to a preliminary examination and to appointed counsel. We agree with the State.

Tennessee Rule of Criminal Procedure 5(d)(1) provides that at a defendant's initial appearance before a magistrate for a felony charge, the magistrate shall advise the defendant of several rights, including:

> (B)    the right to counsel;
> (C)    the right to appointed counsel if indigent; . . . and
> (G)    the right to a preliminary examination.

See also T.C.A. § 40-10-101 (2010). If a defendant waives a preliminary examination, also known as a preliminary hearing, the trial court shall bind him over to the grand jury. See Tenn. R. Crim. P. 5(d)(2). A waiver of a preliminary examination must be in writing. See id. at (c)(2)(B), (e)(1). If a defendant who is not currently in custody is not afforded a preliminary examination within thirty days, the remedy is dismissal of the indictment. See id. at (e)(4). A defendant's Sixth Amendment right to counsel attaches when the State initiates adversarial proceedings. See State v. Rollins, 188 S.W.3d 553, 566 (Tenn. 2006). The adversarial process is initiated when the State files formal charges against the defendant. Id.

At the hearing on the Defendant's motion to dismiss the indictment or remand for a preliminary examination, the Defendant testified that he appeared in Monroe County General Sessions Court on January 20, 2009, and requested a continuance because he did not have an attorney and his witnesses could not be there. He said that he had not tried to retain an attorney because he could not afford one and that he asked the general sessions court to appoint an attorney. He said the court denied both his requests. He said that he spoke with a representative of the District Attorney's Office, who made a plea offer of 150 days in jail, two years' suspended license, and "some" probation.

The Defendant testified that he rejected the plea offer. He identified a document with his signature and said the signature marked where he waived his right to a preliminary examination. He said he signed the waiver because the general sessions court told him that he had either to bind the case over to the grand jury or to plead guilty. He said that if he had not appeared that day, his case would have been continued. He said that because of a bad snow storm, the court was excusing people for not appearing.

On cross-examination, the Defendant testified that he was arraigned on or about December 15, 2008, and that he told the general sessions court at his arraignment that he intended to hire an attorney. He said he did not speak to an attorney between his arraignment and appearance on January 20, 2009. He denied knowing that he could not plead guilty to a felony in general sessions court. He said he only spoke with the judge when he signed the waiver at the bench. Defense counsel introduced the affidavit of complaint as an exhibit and noted that it listed "DUI, 3rd" as the offense, a misdemeanor.

In denying the motion, the trial court stated:

> I think counsel is right in that the remedy would be to dismiss this if the state did something to deprive him of his preliminary hearing within 30 days if he's not in custody and within 10 days if he is in custody. I think that's the way that works. But it is not, and I'm not considering what I routinely see which is people that tell you they want a lawyer and then they do absolutely nothing when they leave the courtroom to try to secure it. They don't even go see lawyers. But I am going to consider what Mr. Bright [testified] to, and that's exactly what he did, he walked out of the courtroom after he asked Judge Dixon for time to hire a lawyer and then he did absolutely nothing, and then when he came back January the 20th, which was his next court date, he signed a waiver. There's no proof of any force or coercion to do so, there's no proof that it wasn't

voluntary, and the [waiver] he signed was right there on the same piece of paper where somebody wrote "2 years after 150 days in jail," which is the mandatory minimum on a felony when something is waived over to the criminal court. There's just no proof that anything he did was anything other than voluntary and knowing, and that the state did anything to deprive him of his right to a preliminary hearing as prescribed by law and so the motion to dismiss will be denied.

The trial began the day after this hearing, and out of the presence of the jury, the trial court allowed the Defendant to testify further regarding his motion to dismiss the indictment or remand for a preliminary examination. The Defendant testified that after his arraignment on December 15, 2008, he spoke with his current defense counsel. He identified a receipt for $300 and said he paid the money as a retainer. He said that the $300 was not enough to cover a court appearance and that he did not pay the balance before the January 20, 2009 court date. He said that he did not remember the retainer when he testified the day before but that he remembered asking the general sessions judge to continue the case for a week or two because he had retained a lawyer.

The Defendant argues that the general sessions court compelled him to waive his case to the grand jury by denying his January 20 request for a continuance and that in so doing, the court denied his right to counsel. He also argues that he was unemployed and would have qualified for indigent status and thus an appointed attorney. The State argues that the Defendant was given adequate time to hire counsel and that no evidence suggested the Defendant was coerced or pressured into waiving his rights to counsel and a preliminary examination. We agree with the State.

The record shows that the Defendant was charged with DUI on December 12, 2008. The Defendant testified that he appeared in general sessions court on or about December 15, 2008, and that the court granted him a continuance to hire an attorney. His next appearance was thirty-six days later on January 20, 2009. The record contains the receipt to which the Defendant testified on the day of the trial, which showed that the Defendant wrote a $300 check on December 15, 2008, as a retainer of defense counsel. The record shows that the trial court appointed counsel on March 26, 2010, in response to the Defendant's affidavit of indigency. The record contains no affidavit of indigency for the time period in which the Defendant requested a continuance to retain counsel and no other evidence that the Defendant attempted to complete his payment to defense counsel or secure appointed counsel before his January 2009 court date. The Defendant appeared before the general sessions court on January 20 without the counsel that he had been granted a continuance to obtain. He rejected the State's plea offer. The record contains no evidence that the Defendant was

coerced or pressured into signing the waiver of his right to a preliminary hearing and to an attorney. The Defendant is not entitled to relief.

## IV

The Defendant contends that the trial court erred by imposing confinement for the maximum allowable sentence because the court incorrectly applied enhancement factor (10), that the Defendant had no hesitation about committing a crime when the risk to human life was high, and because he was a suitable candidate for sentencing under the Community Corrections Act of 1985. See T.C.A. §§ 40-35-114(10), 40-36-103(1) to -306 (2010). The State concedes that the evidence did not support application of enhancement factor (10). However, the State contends that the erroneous application of one enhancement factor should not affect the length of the sentence in light of the remaining factors and that the Defendant has failed to prove his suitability for alternative sentencing. We agree with the State.

At the sentencing hearing, Sean-Patrick Moore, the presentence investigation officer, testified that he prepared the Defendant's presentence report. When asked about his notes on a federal conviction for which the Defendant was on parole when this offense was committed, Officer Moore said the Defendant provided the information. He said he had not spoken to a federal probation officer. He said the Defendant provided information regarding his alcohol use, including that he drank from age twelve until age fifty-one and that he committed crimes when intoxicated. He said the Defendant reported using marijuana from ages thirteen to forty-eight and quitting because of jobs and drug testing for federal probation.

The State noted that it had been unable to confirm the federal felony conviction or determine whether the underlying offense would have been a felony under state law. Defense counsel argued that because there was no proof in the record of a prior felony, the trial court should not sentence the Defendant to the maximum in the range.

In sentencing the Defendant, the trial court stated:

> I find the defendant does have a previous history of criminal
> conviction[s] or criminal behavior in addition to those necessary
> to establish the appropriate range, and I apply that as an
> enhancement factor. And based on the testimony that we heard
> at trial I also find that, which was quite strong about him going
> into the oncoming lane of traffic, I also apply the factor that the
> defendant had no hesitation about . . . committing a crime when
> the risk to human life was high, and further I find at the time . .

-16-

. the felony was committed one of the following classifications was applicable to this defendant and he was on a form of supervision. Also, in determining whether or not this defendant should receive alternative sentencing, which the law says we shall consider that, well, I look at that prior record and I see that [every] single judgment of conviction indicates that he has been given an opportunity for probation. He has had probation I don't know how many times and it has been totally and completely unsuccessful. So what is the evidence contrary to alternative sentencing? Measures less restrictive than confinement have very frequently and recently been applied to Mr. Bright, and they have been applied unsuccessfully to him. Also he has at least in this pre-sentence report, if you just look at the years since he was . . . 32 years old there's hardly a year gone by that he hasn't been committing criminal acts, and so I find that confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct. So I find those two factors to fit Mr. Bright as well, and I do sentence him to the maximum that the law does allow, which is two years in the Department of [Correction].

Appellate review of sentencing is de novo on the record with a presumption that the trial court's determinations are correct. T.C.A. §§ 40-35-401(d), -402(d) (2010). As the Sentencing Commission Comments to these sections note, the burden is now on the appealing party to show that the sentencing is improper. This means that if the trial court followed the statutory sentencing procedure, made findings of fact that are adequately supported in the record, and gave due consideration and proper weight to the factors and principles that are relevant to sentencing under the 1989 Sentencing Act, we may not disturb the sentence even if a different result were preferred. State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991).

When determining if confinement is appropriate, the trial court should consider whether (1) confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct, (2) confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to people likely to commit similar offenses, or (3) measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant. T.C.A. § 40-35-103(1)(A)-(C). The trial court may also consider a defendant's potential or lack of potential for rehabilitation and the mitigating and enhancement factors set forth in Tennessee Code Annotated sections 40-35-113 (2010) and -114. T.C.A. §§ 40-35-103(5),

-210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). The sentence imposed should be the least severe measure necessary to achieve the purpose for which the sentence is imposed. T.C.A. § 40-35-103(4).

In sentencing the Defendant to the maximum in the range, the trial court applied four enhancement factors: (1) that the Defendant had a previous history of criminal convictions and behavior, (8) that the Defendant failed to comply with the conditions of a sentence involving release into the community, (10) that the Defendant had no hesitation about committing a crime when the risk to human life was high, and (13) (C) that the Defendant was on probation at the time of the offense. See T.C.A. § 40-35-114. The trial court applied no mitigating factors. See T.C.A. § 40-35-113.

The Defendant argues and the State concedes that the trial court erred by applying enhancement factor (10) because the State presented no evidence that others were in the area where the Defendant's offense occurred. We note that although Officer Presley said at the suppression hearing that dispatch told him an unidentified person reported that the Defendant had run someone off the highway, no proper substantive evidence of that event was presented. This court has held that because the punishment provided by the DUI statute addresses the threat that impaired drivers pose to public safety, enhancement factor (10) should only apply to DUI sentencing when the record indicates that another person was "actually threatened by the Defendant's driving." See State v. Rhodes, 917 S.W.2d 708, 714 (Tenn. Crim. App. 1995). We conclude that the trial court erred in applying enhancement factor (10).

The Defendant argues that application of the remaining enhancement factors did not justify the maximum sentence. Although the trial court erred in applying enhancement factor (10), we conclude that the trial court did not err by imposing the maximum sentence in the range because the other factors were entitled to substantial weight. The trial court emphasized the Defendant's extensive history of criminal activity and lack of success with alternative sentencing. As the trial court noted, the record shows that for nearly twenty years, the Defendant committed some type of crime almost yearly, that he was repeatedly granted probation, and that he was on probation when he committed this offense. The trial court sentenced the Defendant in accordance with the principles and purposes of the Criminal Sentencing Reform Act, and he has not shown that the sentence was improper.

The Defendant argues that the trial court erred by not imposing a sentence of split confinement or, in the alternative, placing him in the community corrections program. He argues that alternative sentencing is justified because he is a nonviolent offender whose convictions have primarily related to substance abuse. The State argues that the Defendant failed to prove his suitability for alternative sentencing because of his extensive criminal

history and failure to succeed when measures less restrictive than confinement were applied to him. We agree with the State.

The Defendant is eligible for probation because his sentence is under ten years and because his offense is not among those excluded from consideration for probation. See T.C.A. § 40-35-303(a) (Supp. 2007) (amended 2009, 2010). Absent evidence to the contrary, he could be considered a favorable candidate for alternative sentencing because he is a standard offender convicted of a Class E felony. See T.C.A. § 40-35-102(6) (2010) (stating that an eligible defendant who is "an especially mitigated or standard offender convicted of a Class C, D or E felony should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary"); see also State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008).

In denying any form of probation, the trial court found that the Defendant was repeatedly granted probation in the past with no record of rehabilitative success. The Defendant acknowledged that he was on probation for a federal offense at the time of this offense. We conclude that in denying probation, the trial court properly considered sentencing factors within the Sentencing Reform Act, the Defendant's potential for rehabilitation, and applicable enhancement factors.

The Defendant's argument regarding community corrections is based on his long history of crimes related to substance abuse. Under the Tennessee Community Corrections Act, trial courts may sentence certain non-violent felony offenders to community-based alternatives to incarceration. See T.C.A. § 40-36-103(1); State v. Grigsby, 957 S.W.2d 541, 547 (Tenn. Crim. App. 1997) (stating that "trial courts are in the best position to ascertain an offender's amenability to a community corrections program"). Subsection (c) provides that defendants "who would be usually considered unfit for probation due to histories of chronic alcohol or drug abuse or mental health problems, but whose special needs are treatable and could be served best in the community" may be eligible for community corrections. See T.C.A. § 40-36-106(c).

For a defendant to be eligible for the special needs provision of community corrections, the trial court must determine that (1) the defendant is eligible for probation, (2) the defendant has a history of substance abuse or mental health problems, (3) these factors reasonably related to and contributed to the criminal conduct, (4) the special need is treatable, and (5) the treatment could be best served in the community. See Grigsby, 957 S.W.2d at 546-47 (citing Boston, 938 S.W.2d at 439). The defendant carries the burden of showing eligibility for the special needs provision. See Grigsby, 957 S.W.2d at 547 n.11.

-19-

The Defendant's argument is based on only the first three requirements. He presented no evidence that his special need was treatable or that such treatment would be best served in the community. The presentence report shows that the Defendant had a history of substance abuse that was related to and contributed to his criminal conduct. The Defendant, though, testified at trial that he drank only "a shot" on the day of the offense, and the presentence report reflects he told his probation officer that he had stopped drinking. The Defendant has not carried his burden of showing a special need that would be best served by treatment in the community. See Grigsby, 957 S.W.2d at 546-47. We conclude that the trial court did not abuse its discretion by denying alternative sentencing.

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
JOSEPH M. TIPTON, PRESIDING JUDGE